IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AMBER ACKERMAN *on behalf of* B.A., | CASE NO. 3:23-cv-2382 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Amber Ackerman, on behalf of B.A., filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 8. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In March 2022, Ackerman filed an application for Supplemental Security on behalf of her minor child, B.A., alleging a disability onset date of June 1, 2021,[1] and claiming that B.A. was disabled due to attention deficit

---

[1]      "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 22, 425 (6th Cir. 2006).

hyperactivity disorder (ADHD), vitiligo (loss of skin pigmentation), speech impairment, "IEP," and bradycardia. Tr. 160–61, 182–83. The Social Security Administration denied Ackerman's application at the initial level and on reconsideration. Tr. 73, 84. Ackerman then requested a hearing before an Administrative Law Judge (ALJ). Tr. 89.

In April 2023, an ALJ held a hearing, at which Ackerman testified. Tr. 34–51. In June, the ALJ issued a written decision finding that B.A. was not disabled. Tr. 14–29. The ALJ's decision became final on October 31, 2023, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Ackerman filed this action on behalf of B.A. on December 14, 2023. Doc. 1. She asserts the following assignment of error:

> Whether the ALJ erred when she found that B.A.'s severe impairments where not functionally equivalent to a listed impairment when the evidence demonstrates that B.A.'s severe impairments result in marked limitations in two domains of functioning.

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

B.A. was born in 2018 and was three years and nine months old on the date Ackerman filed the application. Tr. 18.

*Medical and educational evidence*

B.A. received treatment for dysfunction of eustachian tubes in both of his ears. Tr. 237. In December 2020, he underwent surgery for bilateral

myringotomy and tube placement, in which tubes were inserted into B.A.'s ears. Tr. 252.

In June 2021, when he was three years old, B.A. underwent an autism assessment. Tr. 296. The evaluator recounted B.A.'s history, which included the following. B.A. was a picky eater. Tr. 296. He could be aggressive. Tr. 296. He had delayed speech and language, severe temper tantrums, and difficulty sleeping. Tr. 296. He was not taking any medications or receiving therapeutic services. Tr. 296. At the conclusion of the assessment, the evaluator determined that B.A. did not meet the criteria for autism spectrum disorder, but opined that he may benefit from occupational and speech therapy. Tr. 297.

In August 2021, B.A. saw psychologist Alison Burke, Ph.D., and developmental pediatrician Jessica Foster, M.D., at the Autism Diagnostic Clinic. Tr. 261. Although autism had been ruled out, it was recommended that B.A. keep an appointment to address behavioral concerns. Tr. 261. Drs. Burke and Foster recounted B.A.'s history as reported by Ackerman. Tr. 261. The doctors wrote that B.A. was "extremely impulsive and hyperactive" and that this "impact[ed] him in all environments and impact[ed] his interactions with others." Tr. 261. Additionally, B.A.'s speech was delayed. Tr. 261. During the evaluation, the doctors observed that B.A. "was extremely active, climbing on the table [and] chairs, turning the lights off, [and] grabbing at the examiner and the computer." Tr. 264. B.A. required "nearly constant redirection" and

exhibited attention-seeking behavior. Tr. 264. He also "drooled" "quite a bit." Tr. 264.

The doctors' testing showed that B.A. had average visual reception and receptive language skills. Tr. 266. He performed in the "very low range" on fine motor and expressive language skills, "suggesting that he exhibits significant difficulty with visual-motor tasks and expressing himself verbally." Tr. 266. B.A. did not display significant symptoms consistent with autism disorder. Tr. 266. The doctors concluded that B.A. had "clinically significant symptoms of hyperactivity, impulsivity and inattention which [we]re severe and impacting his safety." Tr. 268. The doctors' diagnostic impression was ADHD, expressive language disorder, and fine motor delay. Tr. 268. They prescribed to B.A. a trial of Tenex, with instructions to incrementally increase the dosage. Tr. 268. They advised that he continue taking melatonin to help with his sleep and recommended speech and occupational therapy. Tr. 268.

Later that month, B.A. had a tele-health follow-up with Dr. Burke. Tr. 275. Ackerman reported that the increased dosage of Tenex seemed to make B.A. more hyper. Tr. 276.

In October 2021, B.A. had a tele-health visit with Dr. Foster. Tr. 277. Ackerman reported that B.A. was doing well on Tenex. Tr. 277. B.A.'s school had characterized B.A. as "still pretty hyper" in the morning," but "[o]verall he's doing well in preschool." Tr. 277. Dr. Foster commented that B.A. "has

made a great transition to preschool programming" and increased his Tenex dosage. Tr. 279.

The school implemented an individual education plan (IEP) for B.A., covering January 2022 through January 2023. Tr. 170. The plan noted that B.A. took medication for ADHD. Tr. 171. Ackerman had reported that B.A.'s ADHD behavior could become "quite severe." Tr. 171. B.A. needed assistance getting dressed—at occupational therapy he worked on using zippers and putting on shoes and socks. Tr. 171. He demonstrated below-average visual and motor skills, which made it difficult for him to complete classroom activities. Tr. 171. He "may be easily distracted by visual stimuli in the school environment." Tr. 171. His "sound development skills f[e]ll below average," which "could affect his ability to" communicate effectively. Tr. 172.

In February 2022, B.A. saw his primary care pediatrician Paul Wnek, M.D. Tr. 618. Ackerman told Dr. Wnek that B.A. had "good days," but that the "majority of his days it seem[ed] that the medication [wa]s not working." Tr. 618. She said that the medication initially helped, but at the time of this appointment B.A. seemed to be "jumping off the walls again." Tr. 619. Dr. Wnek observed that B.A. had an "abnormal" mood and behavior and increased B.A.'s dosage of Guanfacine, which is the generic form of Tenex. Tr. 620.

In March 2022, Ackerman told Dr. Wnek that B.A.'s symptoms hadn't changed—he still lacked focus and attention and was very hyperactive. Tr. 622. He was more aggressive when he didn't get his way. Tr. 622. Dr. Wnek

5

observed that B.A. had an "abnormal" mood and behavior and increased his medication. Tr. 623.

In early April 2022, B.A. saw the surgeon who placed tubes in his ears for a follow-up visit. Tr. 244. The surgeon noted that B.A. had experienced one ear infection "over the past year" and that B.A.'s ears "look[ed] good." Tr. 244–45.

In mid-April 2022, Ackerman told Dr. Wnek that the increased medication dosage did not make a difference in B.A.'s behavior; he was "bouncing off the walls in the morning." Tr. 625. But "[w]hen he is on the medicine, he seems to be okay." Tr. 625. The school and occupational therapist had reported that B.A. had better focus and concentration. Tr. 625. Ackerman said that at home, B.A. tended to do dangerous things, such as jumping off of furniture and climbing on chairs. Tr. 625. Dr. Wnek's exam findings showed that B.A. had a normal mood and behavior. Tr. 626. Dr. Wnek stated that B.A. was doing well on his current medication. Tr. 626.

A few days later, B.A. followed up with Dr. Foster. Tr. 515. Dr. Foster reported that B.A. had "responded reasonably" to an increased dose of Tenex and commented that he was "now being managed by Dr. Wnek." Tr. 517. Dr. Foster "[s]uspect[ed]" that in the future, B.A. would benefit from a transition to a stimulant, such as Adderall, and that "as [B.A.'s] communication skills continue to improve, his behaviors will improve as well." Tr. 518.

In late April 2022, B.A. followed up with primary care doctor Scott Kaple, D.O. Tr. 735. Ackerman stated that B.A.'s medication was "very effective," and that B.A. had made improvements in his academics, attentiveness, and hyperactivity, among other areas. Tr. 735. Dr. Kaple noted that B.A. displayed a normal mood and affect. Tr. 736.

In May 2022, Ackerman told Dr. Wnek that the Guanfacine was making B.A. hyperactive and it wasn't working for him. Tr. 628. He was waking up at four in the morning "bouncing off the wall." Tr. 628. Dr. Wnek discontinued Guanfacine, prescribed Clonidine, and discussed increasing the melatonin dosage. Tr. 629.

In June 2022, Ackerman told Dr. Wnek that B.A. was doing well. Tr. 636. He had started a new medication, methylphenidate, but it caused increased hyperactivity so he stopped taking it. Tr. 636. B.A. continued to take Clonidine. Tr. 636. Dr. Wnek observed that B.A. had a normal mood and behavior. Tr. 636. He prescribed Adderall, continued Clonidine, and advised Ackerman to follow up in two weeks. Tr. 637. Two weeks later, Ackerman reported that the Adderall did not seem to be effective when B.A. took it in the morning, but it was effective if B.A. took it in the afternoon. Tr. 640. B.A's exam findings showed a normal mood and behavior. Tr. 641. Dr. Wnek prescribed extended-release Adderall. Tr. 641.

In mid-August 2022, B.A. underwent a consultative speech language evaluation. Tr. 650–53. The evaluator found that B.A. had age-standard

expressive and receptive language skills and mildly impaired articulation skills. Tr. 652. She recommended that B.A. receive consistent speech therapy services and commented that his prognosis was good. Tr. 652.

Meanwhile, in early July 2022, B.A. had started speech therapy. Tr. 829. He was discharged in late August 2022 because Ackerman requested that he have speech therapy only in the summer. Tr. 828, 832. When B.A. was discharged, the therapist noted that he had shown improvement in his ability to follow one-step directions and that he followed two-step directions with 75 percent accuracy. Tr. 829. The therapist commented that B.A. was "talking in longer sentences and using a large variety of words," although he had some syntactic and articulation errors. Tr. 829.

In September 2022, Ackerman informed Dr. Wnek that B.A. was doing well on his medication and he was sleeping well. Tr. 681. Ackerman said that B.A.'s teacher told her that B.A. was doing "really well in school." Tr. 681. Ackerman said that he "gets really frustrated and whiny" when he's playing or when "nothing goes his way." Tr. 681. Dr. Wnek observed that B.A. had a normal mood and behavior. Tr. 682s. He commented that B.A. was doing well on his medication regimen and referred him to a behavioral counselor. Tr. 682.

In October 2022, Ackerman told Dr. Wnek that B.A.'s medication seemed to wear off faster in the afternoon. Tr. 685. B.A. sometimes had difficulty focusing throughout the school day. Tr. 685. Medication only worked part of the day—when he came home from school at midday he was "bouncing

off the walls again." Tr. 685. He needed constant reminders to keep his hands to himself and he "g[o]t a little rough with the other children at school." Tr. 685. Dr. Wnek observed that B.A. had an "abnormal" mood and behavior and increased the Adderall dosage. Tr. 686.

Later that month, B.A. followed up with his ear surgeon. Tr. 249. The surgeon remarked that B.A.'s ear tubes "look[ed] good" and she planned to remove the tubes in six months. Tr. 250.

In November 2022, Ackerman told Dr. Wnek that the Adderall wore off around midday. Tr. 697. Dr. Wnek noted B.A.'s normal mood and behavior and increased the Adderall dosage and advised Ackerman to give it twice a day. Tr. 697–98.

During a visit in December 2022, Ackerman informed Dr. Wnek that B.A. was doing well on his medications. Tr. 803. Dr. Wnek observed that B.A. had a normal mood and behavior and continued the current medications. Tr. 804.

In February 2023, B.A.'s teacher, Sara Stang, completed a teacher's questionnaire and reported that B.A. qualified for speech therapy and occupational therapy. Tr. 222. B.A. had frequent absences, and, overall, his pre-academics were good. Tr. 223. B.A. followed directions with minimal reminders. Tr. 223. He was sometimes difficult to understand due to articulation errors. Tr. 225. Some days he was more hyper than others, and he needed extra reminders to follow directions. Tr. 225.

9

In March 2023, Dr. Wnek completed a functional assessment on B.A.'s behalf. He wrote that he began treating B.A. for ADHD and behavioral issues in February 2022. Tr. 835. He commented that B.A. had taken "multiple medications with poor response." Tr. 835. Dr. Wnek opined that B.A. had limitations in all areas of functioning, including "marked" limitations in the following areas: attending and completing tasks; functioning without constant supervision; understanding and remembering simple instructions; not being distracted or distracting others; staying on task; avoiding self-harming behaviors or dangerous activities; and caring for himself compared to others his age. Tr. 835–36. Dr. Wnek found that B.A. was "extremely" limited in his ability to function independently. Tr. 836.

*State agency opinions*[2]

In September 2022, Robert Klinger, M.D., reviewed B.A.'s record and found that B.A. had a speech and language impairment and ADHD. Tr. 55. Dr. Klinger found that B.A. had a marked limitation in interacting and relating with others, no limitation in health and physical well-being, and less-than-marked limitations in the remaining four domains: attending and completing

---

[2]      When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

tasks; acquiring and using information; moving about and manipulating objects; and caring for oneself. Tr. 55–56. In November 2022, Aubrey Todd, Ph.D., affirmed Dr. Klinger's findings. Tr. 64–66.

*Hearing testimony*

Ackerman, who along with B.A. was represented by counsel, testified at the telephonic administrative hearing held in April 2023. At the time of the hearing, B.A. was four years old and enrolled in a half-day preschool program and had an Individualized Education Plan. Tr. 40–41. Ackerman stated that B.A. was diagnosed with ADHD at age three and was "very hard to control to stay on task." Tr. 40–41. Teachers had to constantly repeat themselves in class to get B.A. to stay focused. Tr. 41. B.A. got "a little too rough with his … classmates." Tr. 41.

B.A. received speech therapy in school to help with his articulation. Tr. 41–42. Ackerman sometimes had difficulty understanding B.A., which upset him. Tr. 45. This caused temper tantrums, from which B.A. usually took ten to fifteen minutes to calm down. Tr. 45.

B.A. took medication every day, including Adderall and Clonidine. Tr. 46–47. Some days the medication helped, but other days it didn't seem to work. Tr. 47. Even with medication, B.A. was aggressive with the family dogs, "bounc[ed] off the walls," and threw temper tantrums. Tr. 47. He destroyed toys. Tr. 47. When he performed chores, such as picking up his toys, he went off-task. Tr. 48. When Ackerman tried to read a book to B.A., he wouldn't sit

long enough for her to finish. Tr. 48. He couldn't sit through meals. Tr. 49. He sometimes physically fought with his 11-year-old sister. Tr. 49. When Ackerman put B.A. in time-out to discipline him, he threw fits, during which time he would throw himself on the ground, hit walls, and hit himself. Tr. 50.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born [i]n … 2018. Therefore, he was a preschooler on March 9, 2022, the date the application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since March 9, 2022, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and expressive language disorder (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since March 9, 2022, the date the application was filed (20 CFR 416.924(a)).

Tr. 18–29.

12

**Standard for Disability**

A child claimant, under the age of 18, is entitled to receive supplemental security income benefits if the claimant establishes the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

An ALJ is required to follow a three-step sequential analysis to make a disability determination for a child claimant:

1. Is the claimant engaged in any substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the claimant is not disabled.

20 C.F.R. § 416.924(a)–(d).

To determine under step three whether a claimant's impairment functionally equals a listing, the ALJ considers six domains of functioning: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) "[c]aring for yourself"; and (6) "[h]ealth and physical well-being."

20 C.F.R. § 416.926a(b)(1)(i)–(vi); *see Smoot v. Comm'r of Soc. Sec.*, No. 5:22-CV-1235, 2023 WL 1413097, at \*12 (N.D. Ohio 2023); *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 855 (E.D. Mich. 2012) (citing 20 C.F.R. § 416.926a). To establish a functional impairment equal to the listings, the claimant must show an "extreme" limitation in one domain or a "marked" impairment in more than one domain. 20 C.F.R. § 416.926a(d). As in any Social Security disability case, the child claimant has the burden of proof at steps one through three. 20 C.F.R. § 416.912(a); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

### Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 100.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

During step three of the disability analysis, the ALJ identified one marked limitation in interacting and relating with others and several less-than-marked limitations. Tr. 22. Having found only one marked limitation, the ALJ concluded that B.A. was not disabled. Tr. 29. *See* 20 C.F.R. § 416.926a(d) (a claimant must show an "extreme" limitation in one domain or a "marked" impairment in more than one domain to show that they are disabled).

Ackerman alleges that the ALJ erred when she found that B.A. had a less-than-marked limitation, instead of a marked limitation, in the domain of attending and completing tasks. Doc. 9, at 8. Ackerman advances this argument on two grounds. First, Ackerman contends that the ALJ "selectively reviewed the record" and failed to consider Dr. Wnek's progress notes. Doc. 9,

15

at 10. Second, she contends that the ALJ illogically relied on teacher Stang's questionnaire. *Id.* Both arguments fail.

Ackerman's first argument fails because it adopts an overly narrow reading of the ALJ's decision that does not account for the totality of the ALJ's rationale. In her brief, Ackerman alleges that the ALJ didn't consider Dr. Wnek's progress notes, and "only considered the April 2022 progress note from Dr. Kaple." Doc. 9, at 10. But in the paragraph focusing on B.A.'s ability to attend and complete tasks, the ALJ discussed several pieces of evidence in addition to Kaple's note. Tr. 25. These include (1) the state agency reviewer's opinion that B.A. had a less-than-marked limitation in the domain, (2) B.A.'s ability to follow one-step instructions and two-step instructions with seventy-five percent accuracy following his discharge from speech therapy, (3) the report that B.A. had made "good progress" towards his occupational therapy goals, and (4) teacher Stang's view that B.A. "was helpful in the classroom and ... followed directions with minimal reminders." Tr. 25.

Ackerman does not challenge the ALJ's reliance on the first three pieces of evidence. Taken together, this evidence is substantial evidence to support the ALJ's decision. *See Maldonado v. Kijakazi*, No. 4:20-cv-1878, 2022 WL 361038, at *6 (N.D. Ohio 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision") (collecting cases), *report and recommendation adopted*, 2022 WL 356557 (N.D. Ohio 2022)); *Williams v. Comm'r of Soc. Sec.*,

No. 1:16-cv-1201, 2017 WL 2304420, at *17 (N.D. Ohio Apr. 12, 2017) (the ALJ's finding that the claimant had a less-than-marked limitation in attending and completing tasks was supported by the state agency reviewer's opinion, in addition to evidence showing that the claimant could follow single-step instructions), *report and recommendation adopted*, 2017 WL 2303998 (N.D. Ohio 2017); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (substantial evidence supported the ALJ's decision when the ALJ in part cited the claimant's progress in therapy). Ackerman doesn't challenge the ALJ's reliance on this evidence.

And elsewhere in her decision, the ALJ recounted Dr. Wnek's progress notes, including Ackerman's reports that B.A.'s medication wasn't working well and Dr. Wnek's resultant medication adjustments. Tr. 24–25. So the ALJ considered Dr. Wnek's progress notes. Moreover, the ALJ's recitation of the evidence shows that by October and through December 2022, Ackerman reported to multiple providers, including Dr. Wnek, that B.A. was "doing really well overall," "doing well on his medications," and "doing well in school." Tr. 24 (citing Tr. 660, Dr. Foster's October 2022 note; Tr. 799, Dr. Wnek's November 2022 note; Tr. 803, Dr. Wnek's December 2022 note). The ALJ remarked that in February 2023, Ackerman told Dr. Kaple that B.A. "did not have issues sleeping, he was not irritable, and he did not experience mood swings." Tr. 24 (citing Tr. 754). The ALJ also commented that during this time, B.A.'s providers found him to have a normal mood and behavior. Tr. 24. So Ackerman

17

has not shown that Dr. Wnek's progress notes undercut the ALJ's finding that B.A. had a less-than-marked ability to attend and complete tasks.

Ackerman's second argument is that the ALJ illogically evaluated teacher Stang's questionnaire. It's not clear whether Ackerman challenges the ALJ's reliance on Stang's questionnaire when evaluating B.A.'s ability to attend and complete tasks. *See* Doc. 9, at 10. If so, any argument would fail. The ALJ wrote that Stang "noted that the claimant was helpful in the classroom and he followed directions with minimal reminders." Tr. 25. Ackerman argues that Stang also indicated that there were days when B.A. required "extra reminders and is more hyperactive." Doc. 9, at 10; Tr. 225. But the ALJ later acknowledged those comments by Stang. Tr. 27 (ALJ reciting Stang's statements in her questionnaire, including that on some days B.A. was more hyperactive and needed extra reminders). Furthermore, Stang's comment that B.A. was helpful and followed directions with minimal reminders was made in answer to the question asking Stang to "set forth any difficulties [B.A.] has attending and completing tasks such as requiring extra assistance, extra instructions, extra time to complete tasks, etc." Tr. 223. The ALJ's reliance in the "attending and completing tasks" domain on Stang's answer to the question directly addressing B.A.'s ability "attending and completing tasks" was not "[il]logical."

Finally, although Ackerman limits the arguments in her brief to the ALJ's finding in the "attending and completing tasks" domain, Doc. 9, at 9–10,

she adds at the end of her brief an assertion that the ALJ's citation to Stang's comments in the "interacting and relating with others" domain also was "not a logical conclusion," *id.* at 10. But the ALJ found that B.A. had a "marked" limitation in the domain "interacting and relating with others." Tr. 25–26. So it is not clear what Ackerman objects to. She cites the following portion of the ALJ's evaluation of Stang's questionnaire, Doc. 9, at 10, in which the ALJ wrote:

> Given the claimant's days that he required extra reminders and he was more hyperactive, it is reasonable to find a marked limitation interacting and relating with others. However, his pre-academics were good and he followed directions with only minimal reminders, which supports less than marked limitations acquiring and using information, and attending and completing tasks.

Tr. 27. Ackerman alleges that "the need for extra reminders and hyperactivity seriously impacts B.A.'s ability to attend and complete tasks," rather than B.A.'s ability to interact and relate with others. Doc. 9, at 10. But hyperactivity can be relevant to multiple domains, including interacting and relating to others *and* attending and completing tasks. *See* Soc. Sec. Ruling 09-5p, "Determining Childhood Disability—The Functional Equivalence Domain of 'Interacting and Relating With Others,'" 2009 WL 396026, at *4–5 (S.S.A. Feb. 17, 2009) (explaining that particular behavior may be evaluated under multiple domains, and a hyperactive child may exhibit behavior that is relevant to the domain of interacting and relating with others); *see* Soc. Sec. Ruling 09-4p, "Determining Childhood Disability—The Functional

19

Equivalence Domain of 'Attending and Completing Tasks,'" 2009 WL 396033, at *3 (S.S.A. Feb. 18, 2009) (describing how hyperactivity in children can cause problems with attending and completing tasks). Ackerman doesn't provide any further explanation of what about the ALJ's reasoning she finds objectionable. She hasn't shown that the ALJ's evaluation of Stang's questionnaire was faulty. She hasn't shown that Stang's comments—B.A.'s "pre-academics were good and he followed directions with only minimal reminders—fail to support a less-than-marked limitation in attending and completing tasks. So she hasn't shown that the ALJ erred, and the ALJ's decision must be affirmed. *See Jordan*, 548 F.3d at 422.

### Conclusion

For the reasons explained above, the Commissioner's decision is affirmed.


Dated: August 22, 2024

 */s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge